UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>DEREK WAI HUNG TAM SING,<br> aka "ceven1073,"<br> aka "chuckeven8,"<br><br>        Defendant. | No. CR 14-212(A)-CAS<br><br><u>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW FOLLOWING<br>BENCH TRIAL</u> |

i

## I.     INTRODUCTION

Defendant Derek Wai Hung Tam Sing is charged in the First Superseding Indictment with 28 counts of unauthorized transmission and attempted transmission of trade secrets belonging to Rogerson Kratos, in violation of 18 U.S.C. §§ 1832(a)(2), (a)(4); four counts of unauthorized possession and attempted possession of trade secrets belonging to Rogerson Kratos, in violation of 18 U.S.C. §§ 1832(a)(3), (a)(4); and one count of unauthorized possession and attempted possession of trade secrets belonging to Precision Engine Controls Corporation, in violation of 18 U.S.C. §§ 1832(a)(3), (a)(4.) Following his waiver of jury trial, this case proceeded to trial before this Court on September 22, 2015.  After fully weighing and considering all of the evidence presented during the trial, as well as arguments made by the parties at the close of trial, the Court hereby finds defendant guilty as to Counts 1 through 32 of the First Superseding Indictment and not guilty as to Count 33 of the First Superseding Indictment.

## II.    The Economic Espionage Act

The Economic Espionage Act, 18 U.S.C. §§ 1831, et seq., criminalizes the theft of trade secrets.  Under the statute a trade secret is defined as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
> > **(A)** the owner thereof has taken reasonable measures to keep such information secret; and
> > **(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public

18 U.S.C. § 1839(3).

1

Applying this definition, the Ninth Circuit has recognized that in order to prove that something is a trade secret the Government must prove three elements.  United States v. Chung, 659 F.3d 815, 824 (9th Cir. 2011).  First, the government must prove that the owner of the trade secret has taken reasonable measures to keep such information secret.  Id.  The owner of a trade secret need only take measures that are reasonable under the circumstances; they do not need to take all conceivable measures. See H.R. Rep. No. 24 104-788, at 7 (1996), reprinted in 1996 U.S.C.C.A.N. 4021, 4026 ("[A]n owner of this type of information need only take 'reasonable' measures to protect this information. . . . [I]t is not the Committee's intent that the owner be required to have taken every conceivable step to protect the property from misappropriation.").  "Security measures, such as locked rooms, security guards, and document destruction methods, in addition to confidentiality procedures, such as confidentiality agreements and document labeling, are often considered reasonable measures."  Chung, 659 F.3d at 825.

Second, the government must prove that the information was not generally known or readily ascertainable by the public.  Id. at 824.  Information is generally considered to be readily ascertainable where "it is available in trade journals, reference books, or published materials."  Id. at 825.  In addition, the mere fact that a particular secret could have been reverse-engineered after a time-consuming and expensive laboratory process does not provide a defense for someone who intended to avoid that time and effort by stealing the secret.  See 4 Roger M. Milgrim, Milgrim on Trade Secrets § 15. 01 [1] [d] [v];  Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc., 35 F.3d 1226, 1237 (8th Cir. 1994) (stating that fact "that one 'could' have obtained a trade secret lawfully is not a defense if one does not actually use proper means to acquire the information"); Telerate Sys., Inc. v. Caro, 689 F.Supp. 221, 233 (S.D.N.Y. 1988) ("[T]he proper focus of inquiry is not whether an alleged trade secret can be deduced by reverse engineering but rather, whether improper means are required to access it.").

2

Third, the Government must prove that the secret derived independent economic value from being secret.  <u>Chung</u>, 659 F.3d at 825.  In assessing the value the secret derives from being secret, "courts most often consider the degree to which the secret information confers a competitive advantage on its owner."  <u>Id.</u> at 826; <u>see also</u> <u>US West Communications, Inc. v. Office of Consumer Advocate</u>, 498 N.W.2d 711, 714 (Iowa 1993)("[I]nformation kept secret that would be useful to a competitor and require cost, time and effort to duplicate is of economic value.").

## III.   FINDINGS OF FACT

1.      To the extent necessary, each of these findings of fact may be deemed to be a conclusion of law.

### A.   Defendant Sing

2.      Defendant is an electrical engineer who has received both a Bachelor's and two Masters of Science degrees in Electrical Engineering.  He has worked as an engineer at, at least, ten different companies since 1993, working with schematics and trade secrets.  Exhibit 106, testimony of defendant.

3.      In connection with his employment with these companies, defendant has signed a number of agreements regarding the confidentiality of his employers' trade secrets.  Exhibits 104, 107, 108, 125, 128.  Defendant understood these agreements to mean that, *inter alia*, company documents were to be returned to the company upon his termination and should not be sent outside of the company without express authorization. Testimony of defendant.

### B.   Precision Engine Controls Corporation

4.       Defendant worked for Precision Engine Controls Corporation ("PECC") as a contract employee from approximately March 2010 through January 2011.  Exhibit 106.  In January 2015, PECC was purchased by Meggitt, Inc.  Testimony of William Conn, Joel Mawhinney.

5.      PECC is a company that designs, manufactures, and supplies industrial turbine products, including valve actuators and control systems.  One of the company's new products, which has only recently come to market, is the Rotary Actuator ("RAX").  The RAX opens and closes valves in large turbine engines; in other words, the RAX precisely controls the flow of fuel and gas to and from the engines for large products included on, among other things, oil rigs.  Testimony of Conn, Mawhinney.

6.      The RAX has two primary circuit boards, the Driver (which controls the power) and the Central Processing Unit ("CPU") (which interprets the commands executed by the person operating the RAX and sends them to the Driver circuit board).  Testimony of Conn.

7.      The RAX Driver is a product used or intended to be used in interstate or foreign commerce.  Testimony of Conn.

8.       In 2010, the then-parent company of PECC, United Technologies Corporation ("UTC"), utilized the services of HCL Technologies Ltd. ("HCL") to identify a potential contract engineer to employ.  HCL, in turn, utilized the services of Prabhav eGlobal Services LLC, also known as Infoways ("Infoways"), to identify potential contract engineers for UTC.  Exhibit 140.

9.      Both the agreements between UTC and HCL, and HCL and Infoways, contained confidentiality agreements which, among other things, required them to bind their employees to not disclose confidential or proprietary information and specified that inventions, designs, and work products made while working for UTC were the property of UTC and its companies.  Exhibits 126, 127.  When Infoways eventually identified and employed defendant, defendant signed an employment agreement.  The employment agreement specified that defendant would receive confidential information belonging to Infoways or its clients, including the "Client's methods, trade secrets, programs, procedures, manuals, confidential reports . . . ."  Exhibit 125.

10.     Defendant further agreed:

4

that he/she will receive all such confidential information in strict confidence and further agrees to maintain and assist the Company in maintaining the secrecy of such information.

Employee further covenants and agrees that every document, computer media, computer software program, notation, record, diary, memorandum, development, investigation, or the like, and any method or manner of doing business of Company made or acquired by the Company during his/her period of employment with Company shall be the sole and exclusive property of Company.  Employee will not during the period of employment nor anytime thereafter, directly or indirectly, disclose to others and/or use for his/her benefit or for the benefit of others, confidential information including but not limited to trade secrets, customer lists, employee and prospective employee information, proprietary software products, profit and loss statements, financial statements, financial ration [sic] analysis and any other financial information pertaining to the business of the Company or any of its clients, consultants, affiliates acquired by him/her during the period of his/her employment; except to the extent as may be necessary in the ordinary course of performing his/her duties as the employee of the Company.  Upon termination of his/her employment by the Company, he/she will return to the Company or to the Company's client all materials and information and any copies thereof and certify to the Company that he/she no longer has any rights to such material or information.

Exhibit 125.

11.    When defendant began work at PECC in March, 2010, he signed an additional agreement directly with UTC wherein he agreed not only not to use the proprietary information of other companies in his work at UTC, but also that he would not disclose technical or business information developed by UTC, and that he would leave with UTC all materials containing such information upon the termination of his employment.  Exhibit 128.

12.    Defendant signed Exhibit 128 in front of PECC Human Resources manager Patricia Clark, who, as a general practice, reviewed these agreements with both incoming and outgoing employees.  Testimony of Clark.  Defendant admitted that he signed this document, and understood that it restricted him from keeping company documents after he left the company.  Testimony of defendant.

13.    The Court finds that the RAX Driver schematic was one of PECC's trade secrets.

14.     PECC took reasonable measures to protect its trade secrets.  For example, PECC schematics, including the RAX Driver schematic, were marked with the following notice:

> Precision Engine Controls Corporation claims proprietary rights in the information disclosed hereon.  This drawing is furnished in confidence on the express understanding that neither it nor any reproduction thereof will be disclosed to others or used for the purpose of manufacture or procurement of the article or part shown hereon.

Exhibit 85.  Employees, including defendant, understood that the notice prohibited them from disclosing the information to others without express authorization.  Testimony of Conn, Mawhinney, defendant.

15.     PECC also had nondisclosure agreements with its vendors and customers who saw trade secrets, but even then, would not let them see the actual schematics. Testimony of Conn.

16.     PECC also protected its trade secrets by physical and technical security including locks and codes on doors, storing of trade secrets on protected servers requiring unique and limited usernames and passwords, limiting access to documents and servers based on supervisor approval and need, routine secure backup of servers, identification tags on visitors, and limiting visitors.  Testimony of Conn, Paul Bench, Mawhinney, and defendant.

17.     The RAX Driver schematic was not something that was known or readily ascertainable by persons outside the company.  Without the schematic, it would likely take a very long time to reverse engineer the RAX Driver circuit board, because just looking at a circuit board would tell someone very little about the way a product has been put together, and why.  This is because there are a number of layers in the circuit board with many connections between the parts.  Without the schematic, a person would first need to figure out what the board does.  A person would need to methodically take off each component, and measure them with a meter to figure out what it is and how it works in the design.  This would be exceedingly difficult and time-consuming, likely

requiring many months of work.  Then, a person would need to examine and repeatedly test the board to determine how it works under various conditions, such as in high or low temperatures.  Overall, this process could take months or even years of dedicated work.  However, having the schematic would drastically decrease the amount of time necessary to reverse engineer the RAX Driver, because much of the information that would be revealed from this testing would be readily apparent simply by reading the schematic.  Testimony of Conn.

18.    The RAX Driver schematic is also not something that is obvious to or already in use by PECC's competitors.  Testimony of Conn, defense expert Noe Martinez.  There are no exact copies of the RAX being sold on the market, and the design is unique.  Testimony of Conn, Martinez.

19.    The RAX Driver schematic also derived independent economic value from being secret, and was valuable to PECC.  Testimony of defendant, Martinez, Conn, Mawhinney, Fred Cordova.  It is the product of a great deal of valuable development time, testing, and certifications.  Testimony of Conn, Mawhinney, Cordova.  In addition, PECC's products are repaired only be PECC.  Accordingly, PECC does not share with any other company the information necessary to perform these repairs, such as the RAX Driver schematic.  If a competitor had the RAX Driver schematic, it could attempt to take over the repair market from PECC.  Testimony of Conn, Cordova.

20.    The RAX design differentiates itself in two important ways.  First, the RAX has integrated electronics that are part of the valve that goes into the customer's engines.  This greatly simplifies installation, and gives PECC a competitive advantage.  Testimony of Conn.  Second, and relatedly, this integration with the engine means that the board needs to work in extreme heat and related conditions.  The design of the circuit board is such that the system conducts heat away from the various parts, and the way in which this is done would not be obvious from just looking at the circuit board.  Testimony of Conn.  The company's competitors do not have a product with the unique

design features of the RAX.  Testimony of Cordova.  This design is also used across many other products PECC sells, which operate under similar conditions.  It is, therefore, a building block for PECC's products and is very valuable to the company.  Testimony of Conn, Cordova, Martinez.

21.     From 2007 to 2014, development costs for the RAX were approximately $3,837,832.  Exhibit 129A; Testimony of Warren.  The development cost for just the RAX Driver board was approximately 12.5 percent of that figure, or $479,729.  Testimony of Conn.  PECC anticipates selling the RAX for $20,000-$30,000 each, and the life expectancy of the RAX is at least 20 years.  Exhibit 129B; testimony of Cordova, Warren.  Anticipated revenue for sales of the RAX and repairs through 2020 are $58,189,267.  Exhibit 129B.

22.     While working for PECC, and against company policy, defendant inserted a thumb drive into his work laptop, copied the following materials, and then saved them onto his personal laptop: (1) the RAX Driver schematic, Exhibit 85; (2) two documents which show the board layout for the RAX Driver, Exhibit 86; (3) a zip file named "latest_gerbers_attached.zip," which includes "gerber" designs for the RAX Driver board that are industry standard methods for communicating how the schematic should be produced into a physical board, Exhibit 87; (4) a zip file named "drilltable.zip," which includes images of the drill tables, which are designs for how the physical board will be drilled to install connections and materials, Exhibit 88; (5) a document named "Test Procedure for the RAX Driver Board rev.2.docx," which sets forth the method for testing if the RAX Driver board is working, Exhibit 89; and (6) a file entitled "PCB_Project1.pdf" which is a detailed PDF of the RAX Driver schematic.  Exhibit 90.  Defendant stored these files on his computer in a folder labeled "precision_engine_controls."  Testimony of defendant, Conn, FBI Special Agent Michael Fitzpatrick.

23.     When defendant completed his work for PECC, he did not return any of these materials to PECC despite his explicit agreement to do so.  Testimony of Clark, defendant.

### C.     Rogerson Kratos

24.     Defendant also worked at Rogerson Kratos ("RK") from April to November, 2012.  Exhibits 107, 108, 109, 119; Testimony of Geoff Owers.

25.     RK is a company headquartered in Pasadena that designs, manufactures, and supplies a product line of instruments, active matrix liquid crystal display systems, and other aerospace products used by many current world airlines, helicopters, and military aircraft.  RK avionics are used in, among others, Bell Helicopters (models 412, 427, 429, and 430), Korean Aerospace, Inc.'s ("KAI") fighter jets used to train fighter pilots, and the CASA line of aircraft (now Airbus).  Among others, the units designed and manufactured by RK consist of: Data Acquisition Units ("DAU"),[1] "Display Units" ("DU"),[2] Electronic Flight Instrumentation Systems ("EFIS"),[3] Integrated Instrument Display Systems ("IIDS"),[4] and Engine Hydraulic Pressure Displays ("EHPD".)[5] Testimony of Owers, Larry Smith.

26.     When defendant was hired by RK, on April 30, 2012, he signed a Confidentiality Agreement.  Exhibit 108.  The agreement defines "Proprietary

---

[1] The DAU for the Bell 427 acquires information from the engine and passes it to the DU, which then processes the information and provides it to the pilot.  Testimony of Owers.

[2] The DU for the Bell 427 converts information from the DAU into a display that can be read by the pilot, including providing engine information and warnings regarding the engine.  Testimony of Owers.

[3] The EFIS for the Bell 430 provides navigational information to the pilot, including speed, direction, pitch, and roll.  Testimony of Owers.

[4] The IIDS for the Bell 430 combines the functions performed by the DU and the DAU on the Bell 427.  First, it acquires information from the engine.  Then, it displays that information to the pilot, including any warnings regarding the engine.  Testimony of Owers.

[5] The EHPD for the KAI jet displays information to the pilot, such as engine temperature, fuel flow, hydraulic information, and oil pressure.  Testimony of Owers.

Information" as including "trade secrets" and "all information that has or could have commercial value." Under the agreement, defendant was obligated to (1) surrender all data, computer files, documents and materials of any nature pertaining to his work with RK to RK upon termination of his employment, and (2) not disclose any RK proprietary information during or after his employment with RK. Exhibit 108. On April 30, 2012, defendant signed an acknowledgment that he had received and was required to read the RK Employee Handbook. Exhibit 107. The Handbook states that he must keep RK's confidential information and trade secrets confidential, that confidential information may not be removed without written authorization, and that former employees may not use or disclose confidential information or trade secrets for any purpose. Exhibit 107. RK employees and defendant understood that these agreements bound them and did not permit employees to keep RK documents after termination. Testimony of Scott Munroe, Michael Veverka, defendant.

27.    When defendant was hired, as is the usual practice, RK Human Resources employee Marissa Lopez provided defendant with these documents, and asked him to review them and sign them. Defendant did so, and had no questions during his approximately 45 minutes to one hour meeting with Lopez. Testimony of Marissa Lopez. Defendant admitted that he understood that these documents required that he not keep any company documents after leaving the company and not send company documents to others without express permission. Testimony of defendant. In addition, at his exit interview, defendant was instructed to return any RK property. Testimony of Lopez.

28.    Defendant is charged with transmission, possession, and attempted transmission and possession of seven RK schematics. Exs. 7A, 7G, 7H, 7I, 7P, 7M, and 7X. The Court finds that these schematics are trade secrets. In addition, each of the trade secrets relate to products made by RK that are used or intended to be used in interstate or foreign commerce. Testimony of L. Smith, Owers.

29.     RK took numerous methods to protect its trade secrets, including these seven schematics.  Testimony of L. Smith.  For example, each of the RK schematics defendant is charged with transmitting and possessing was marked with the following notice, or one similar to it:

> All information contained on this drawing is proprietary to ROGERSON KRATOS for use in operation, repair and maintenance of Rogerson Kratos products.  Its reproduction for use in any other way or for any commercial purpose without prior written permission is forbidden.  All rights on this material are reserved.  This legend shall be marked on any reproduction hereof in whole or in part.

See, e.g., Exhibit 7A.  Defendant, as well as other employees, understood that this notice required that he not keep or distribute the documents outside RK.  Testimony of Veverka, Munroe, Owers, defendant.

30.     RK also had nondisclosure agreements with its vendors and customers who saw trade secrets, but even then, would not let them see the actual schematics. Testimony of L. Smith, Owers.

31.     RK also protected its trade secrets by physical and technical security including locks and codes on doors, storing of trade secrets on protected servers requiring unique and limited usernames and passwords, limiting access to documents and servers based on supervisor approval and need for access, routine secure backup of servers, a sign-in for visitors, and limiting visitors.  Testimony of Owers, Veverka, Munroe, Mark Popovich, defendant.

32.     As part of his duties at RK, defendant was given access to a limited number of schematics and related documents, to include the following (organized by RK project, and including references to exhibit number; charged exhibits are underlined):[6]

**KAI:**
>      7A: "Schematic IO_A, EHPD, CEBI, KAI";
>      7AA: "Schematic IO_A, EHPD, CEBI, KAI"

---

[6] Defendant also obtained other materials, including schematics and test procedures related to the Bell 412 EP and CASA aircraft, along with Bell Helicopter's own documents that were in the custody of RK.  (Exhibits 7Y, 8C-I, 8K, and 8M.)

11

**Bell 427 DAU**:

      7C: "Schematic, Motherboard";

      <u>7G: "Schematic, PCB CPU Module with FPGA";</u>

      <u>7H: "Schematic, Power Supply/Led Backlight Drv.";</u>

      7O: "Schematic, Rear Panel";

      7Q: "Schematic, PCB MBUS, 4 POS";

      7T: "Schematic, Hybrid I/O"

**Bell 427 DU**:

      7D: "Schematic, Motherboard No.2, DU";

      7E: "Schematic; Display Generator";

      7F: "Fan Assembly, Bottom Center";

      7J: "Schematic Power Supply/Led Backlight Drive.";

      7K: "Schematic, PCB, Digital I/O, DU";

      <u>7P: "Schematic, Rear Panel";</u>

      7R: "Schematic, PCB MBUS Interconnect 6 POS";

      7U: "Schematic, Power Supply/LED Backlight Drive";

      7V: "Schematic, Mother Board No.1, DU";

      7W: "Schematic, Display Generator";

      8B: "Schematic, Rear Panel"

**Bell 430 IIDS**:

      7H: "Schematic Diagram, Interconnect";

      <u>7I: "Schematic Power Supply/Led Backlight Drv.";</u>

      7L: "Schematic, Digital I/O IIDS";

      <u>7M: "Schematic Diagram, Display Generator";</u>

      7N: "Schematic Diagram, LQ056A3CH01 UIC";

      7S: "Scm, MBUS Interconnect 8 POS";

      7Z: "Schematic Diagram Analog I/O"

**Bell 430 EFIS**:

      <u>7X: "Schematic Optrex LCDI/LED Driver & Ctrl";</u>

      8A: "Schematic, Rear Panel"

Testimony of Owers, defendant

33. The schematics and documents were for projects that defendant was tasked with working on, and in some instances, the schematics were ones with defendant's notes, or with other indications that defendant had the only printed copy of that schematic. <u>See, e.g.</u>, Exhibit 7A; Testimony of Munroe, Owers, defendant.

34. The charged schematics "Schematic IO_A, EHPD, CEBI, KAI," Exhibit 7A; "Schematic, PCB CPU Module with FPGA," Exhibit 7G; "Schematic, Power

12

Supply/Led Backlight Drv.," Exhibit 7H; "Schematic, Rear Panel," Exhibit 7P; "Schematic Power Supply/Led Backlight Drv.," Exhibit 7I; "Schematic Diagram, Display Generator," Exhibit 7M; and "Schematic Optrex LCDI/LED Driver & Ctrl," Exhibit 7X are each electrical engineering schematics for circuit boards, developed by RK.  The schematics show the process by which real world signals are interpreted into digital data to be displayed for a pilot, and show the connections between the hardware and software to make that happen.  Testimony of Owers.

35.    The charged schematics were not something that was known or readily ascertainable by persons outside the company.  Each schematic took years for RK to develop, including making numerous revisions after conducting tests and obtaining various approvals.  Testimony of Owers, L. Smith.  There are numerous parts on a circuit board and thousands of connections between those parts.  The connections between the parts are critical to the design of the circuit board.  The schematic explains all of these connections and which connections are necessary for the board to work.  Without the schematic, a person could theoretically use a multimeter to determine the connections between the parts.  But where there are thousands of connections to dozens or even hundreds of parts, the task would be incredibly tedious and time consuming.  Another difficulty the competitor would encounter relates to parts.  The schematic provides part numbers for the parts on the board.  If a competitor were to acquire a circuit board and attempt to discover the parts used on the board, in some instances it would not be able to determine the part number with just the physical board because the number is not on the part itself.  Testimony of Owers.  The amount of time it would take to reverse engineer the circuit board with a schematic in hand would be substantially shorter than without the schematic because all of the connections between parts would be readily apparent from the schematic.  Testimony of Owers, Martinez.

36.    The RK schematics are also not something that is obvious to or already in use by RK's competitors.  Testimony of Owers, Robert Taylor, Martinez.  There are no

exact copies of the RK products being sold on the market, and the designs of the schematics are unique.  Testimony of Owers, Taylor, Martinez.

37.     Each charged RK schematic also derived independent economic value from being secret.  Current and former RK employees, including defendant, testified that the schematics were valuable to RK.  Testimony of Owers, Martinez, defendant, L. Smith, Taylor, Jonathan Smith.  The schematics derive value from not being known by competitors because otherwise, the competitors could develop the same exact products much faster.  Testimony of Owers, Martinez, defendant, L. Smith, Taylor.  Moreover, at a minimum, the schematics would enable a competitor to compete with RK for repair work on RK products.  Id.  All schematics for the 427, 430, and KAI have passed rigorous testing, including exposing the circuit board to extreme voltages and power outages.  (Testimony of Owers, Taylor, L. Smith.)  This is because aircraft undergo extreme stresses.  The testing is designed to ensure that RK's avionics can survive those stresses.  Giving a competitor the schematic, which has been refined after substantial testing, would give the competitor a roadmap for how to design a board that would pass these tests.  Testimony of Owers, Taylor, L. Smith.  At trial, defendant admitted that shortcutting that work would be valuable to a competitor because it would expedite the competitors "time to market," i.e., the time necessary to put a product out for sale on the market.  Testimony of defendant.  Defendant also testified that, in his opinion, for companies in RK's industry, "the time to market is crucial."  Testimony of defendant.  Defendant also admitted that the schematics have value to RK.  Testimony of defendant.

38.     In addition, the designs in the schematics were integral to almost every product that RK sells, and were re-used in a variety of products to shorten development time.  For example, the Bell 429 design has a number of boards directly lifted from previous products.  Testimony of Owers.  RK positions itself in the marketplace as unique because it is able to take a stable physical design that is tested and secure, but can

be modified and customized pursuant to a client's needs.  In this way, the schematics were key to RK's business.  Testimony of Taylor.

39.     Furthermore, RK requires its customers to only repair their products through RK.  Accordingly, it does not share with any other company the information needed to do these repairs, such as RK's schematics (including the charged schematics).  If a competitor had these schematics, they could attempt to take over the repair market from RK.  RK's current and former employees testified that the repair market comprises a substantial portion of RK's business.  Exhibit 122; testimony of Taylor, L. Smith, J. Smith.

40.     While working at RK, defendant took home and retained the documents listed above.  In addition, while employed at RK, defendant also took at least 43 pictures of the testing of RK's products on his phone.  Exhibits 38-80, 139; testimony of defendant, Fitzpatrick.  He primarily took the pictures while at a company called Environment Associates, Inc., which would test the above-listed products for RK.  Exhibit 139.  Defendant took the pictures because he felt they were helpful to his work on the schematics, and would be helpful to his supervisors.  Testimony of defendant.

41.     Defendant's performance at RK was marked by delays in completing assignments, late attendance, and an unprofessional attitude.  For example, defendant created, purchased, and distributed to other employees a number of items including mugs, bottle openers, chocolate bars and pens that were inscribed: "Imbecile: a person of very low intelligence; . . . Rogerson Kratos design team member;" or "RK Imbecile Design Team: EO is the key to the design! Let's hold meetings to create EOs to fix our previous EOs;" or "Dark chocolate is much needed for all the IMBECILES on the Rogerson Kratos design team . . . ."[7]  Exhibits 115, 116; testimony of Veverka, defendant.  Defendant spent many hours developing these products, and hundreds of

_____

[7] "EO" is shorthand for "Engineering Order," which is the term used when a product needs to be fixed.

dollars.  Testimony of defendant.  He also sent out unprofessional emails, and caused discord among some of RK's staff.  Testimony of Munroe, Veverka, defendant.

42.     In response, defendant's direct supervisors repeatedly discussed these issues with defendant and advised him to correct his behavior.  On November 26, 2012, defendant was given a negative performance appraisal, which again raised these issues and discussed areas of improvement.  Exhibit 117; testimony of Owers, defendant.  Defendant did not agree with this assessment of his performance and wrote that he disagreed with the evaluation on the performance review.  Defendant's behavior did not improve, and on November 28, 2012, defendant was fired by RK.  Exhibits 118, 119; testimony of Owers, Lopez, defendant.  Defendant was angered by the firing, and felt that he had "lost face" by being fired by people he considered to be lesser engineers.  Testimony of defendant.

43.     Defendant did not return to RK any of the materials he took during his employment, despite his explicit agreement to do so and being asked to do so at his termination meeting.  Testimony of Lopez, defendant.

### D.     Defendant Compiled the Trade Secrets

44.     After being fired from RK, defendant began to scan and package the trade secrets from RK.  He packaged the trade secrets with sufficient supporting documentation and instructions so that other competitor companies would be able to use the trade secrets and reverse engineer RK's products.  Defendant admitted that, in preparing these trade secrets, he "wanted to get back at Rogerson Kratos" for not fully appreciating his work while he was an employee.  Testimony of defendant.

45.     On December 23 and 24, 2012, and January 3, 4, 6, and 7, 2013, defendant spent many hours creating .pdf documents on his home computer by scanning RK physical documents, one-by-one, on his home printer/scanner.  Each document was named by the scanning program on his printer/scanner by the date and time that it was scanned, for example, "12-23-2012 08;36;50PM.pdf."  Exhibits 137, 138; testimony of

defendant, Fitzpatrick.  After these documents were scanned into his computer, defendant zipped the files into one file labeled, "scans.zip."  Exhibits 8A-M; testimony of defendant, Fitzpatrick.  The scans.zip file contained 291 single-page .pdf files.  The documents defendant scanned into his home printer/scanner were later found in a box during the search of defendant's home.  Exhibit 100; testimony of defendant, Fitzpatrick.

46.    On January 7, 2013, defendant took the remaining RK documents to a copy center of some kind, and had them scanned into computer files on a larger machine.  These documents were all scanned into one .pdf document labeled, "schematics.pdf."  Exhibits 7A-AA; testimony of defendant, Fitzpatrick.  Schematics.pdf contains 138 pages of schematics, totaling 27 individual schematics.  The charged schematics are only a portion of the trade secrets included in the document.

47.    On January 8, 2013, defendant also scanned the PECC RAX Driver schematic documents, one-by-one, with his home printer/scanner and created the same type of single-page .pdfs as he had with the RK schematics and documents.  Exhibits 85, 86; testimony of defendant, Fitzpatrick.  The other PECC documents referenced herein were saved to his computer toward the end of his employment with PECC in 2010.  Exhibits 87-90; testimony of defendant, Fitzpatrick.

48.    On January 9, 2013, defendant created two "readme.doc" files: one for RK, and one for PECC.  A readme.doc file is named to catch a recipient's attention and provide the recipient with information about other files in a directory.  Testimony of defendant.  The readme.doc for PECC began with "Per Precision Engine Controls," and then explained what a RAX Driver is and does.  This information was taken directly from PECC's website.  Testimony of defendant.  It then said:

> Enclosed within this memory stick is the schematics and board layout for the power section of the rotary actuator from Precision engine controls corp. There are two electronics pwbs located within this design, the power electronics board and the digital microcontroller board.  The power board is the most difficult part of the design.  You should have all the info necessary to recreate the design.  Purchase a couple of the units and reverse engineer the design.

Now the active clamp has Vishay dale resistors, 50W to absorb the regen power from the 3 phase brushless dc motor. You will find the actual part number in the unit.

When you operate in super slow sine wave analog signal input, 0.1Hz, the brushless motor will exhibit the "cogging" effects. The gearing has to be increased to remove this unwanted effect. Reverse engineer PEC gearing.

20A in the power stage was a big thing for PEC, they were unable to get it using igbts. Increase the size of the housing, the metal aluminum so that you can get 20A for torque. That is a motor spec (inch ounces/A.) Check your motor/torque requirements.

Exhibit 84. This document was saved onto defendant's computer.

49.    The RK readme.doc said:

Enclosed is schematics to LCD avionics helicopter manufacturer. This is the electronics hardware design which is utilized in every product in which they sell. In other words, the manufacturer copies the hardware design across every single product while only changing the software. EFIS, IIDS, DAU, DU. 427, 429 (different power supply), etc. Only the software changes. Order their products and reverse engineer the design. You should have enough info to figure out how they do it. FYI, there are problems within the designs; however, this is the basic framework of how they do their electronic design. Also, there are pictures of the test boxes.

Exhibit 6.

50.    These documents would assist a competitor company in reverse engineering RK and PECC's products. They therefore would provide an economic benefit to these competitors. These documents also demonstrate defendant's belief that the materials he transmitted (or, in the case of PECC, possessed), were proprietary information not otherwise readily available to the public. Defendant created the readme.doc files so that the recipients would understand what they were receiving, and instructed them to reverse engineer the products using the schematics. He also provided advice about how to solve perceived problems with the designs. In the documents, defendant did not make any statement about the designs being bad, embarrassing, or old. Testimony of defendant.

51.    Also on January 9, 2013, defendant created .zip files for the images that he had taken of RK test procedures, and labeled them "images.zip"; "images1.zip"; "images2.zip"; "images3.zip"; "images4.zip"; "images5.zip"; and "images6.zip." These

images had been transferred from his phone, and were found on his computer during the search of his house.  Exhibits 9-15, 38-80, 137; testimony of defendant, Fitzpatrick.

52.    On January 10, 2013, defendant created a .zip file, zipping together the PECC RAX Driver schematic and layout documents he had scanned on January 8, 2013, into a file called "schematicspdf.zip."  He also zipped together other PECC documents into a file called "docs.zip," including the PECC readme.doc file, the Test Procedure, and other documents.  Exhibits 84-90; testimony of defendant, Fitzpatrick.

### E.    Defendant Transmitted the Trade Secrets

53.    On January 9, 2013, defendant created an email address in a false name.  Testimony of defendant.  These email accounts were titled ceven1073@gmail.com and chuckeven8@gmail.com, and did not use any true information or his real name.  Exhibit 29; testimony of defendant.  Defendant created these accounts not at his house, but at a Starbucks using its public wi-fi connection.  Exhibits 27, 28, 29.  Defendant has at least two email accounts using his own name, but chose not to use those accounts to send the trade secrets.  Testimony of defendant, Fitzpatrick.  Accordingly, these email addresses allowed defendant to conceal his true identity.  The fashion in which he created the email addresses and transmitted the trade secrets suggests that defendant believed he was transmitting information of a sensitive nature, such as trade secrets.  Moreover, it suggests that he felt the need to hide his actions from law enforcement, RK, or both, likely because he recognized that his actions would injure RK and benefit its competitors.

54.    Once he had created the email addresses, on the same day, defendant began to email companies that he perceived to be competitors of RK using the ceven1073@gmail.com account, in order to send to them the compiled trade secrets, supporting documents, and readme.doc instructions.  Exhibit 30; testimony of defendant.  Again, defendant tried to hide his involvement; he appears to have sent most or all of these emails while logged in at the Starbucks.  However, on at least one occasion, he

neglected to log out of the ceven1073@gmail.com email account until he was at his house, and thereby accidentally revealed his participation.  Exhibits 28-32.

55.    Defendant spent a few hours on the internet searching for competitors of RK by entering the search terms "LCD Avionics Displays" or something similar. Testimony of defendant.

56.    On January 9, 2013, and on several days thereafter, defendant emailed or contacted through a website the following companies, each of which are avionics companies or have avionics departments: Aspen Avionics, Inc., Meggitt Avionics, AvionicsLCD, Esterline Corporation, The Thales Group, Inc., and Universal Avionics Systems Corporation.  Each time, defendant titled the email "technical support/ engineering support email address?" or something similar, and asked "can you send me your engineering support email address for flight displays?" or something similar. Exhibits 4, 19, 30, 132-135; testimony of defendant, Fitzpatrick.  Defendant testified that he wanted the emails to reach someone in the engineering departments of these companies, presumably so that they would understand the schematics.  Testimony of defendant.

57.    In the case of Aspen, employee Michael Studley responded to the email, and asked defendant to identify himself.  Exhibits 19, 30.  Defendant refused to identify himself, but asked if Aspen manufactured its own flight displays.  When Mr. Studley confirmed that they did, defendant emailed him "schematics.pdf," "scans.zip," and six of the seven images.zip files, along with the readme.doc, despite Mr. Studley asking defendant to stop.  Defendant said in the email "please find the attached technical documentation (schematics.) I will be sending it in several emails. Please forward it to your engineering group."  Exhibits 19, 30.

58.    Defendant also attempted to send RK's materials to The Thales Group, Inc., but the emails failed to go through.  Exhibit 30.

59.     In the case of Meggitt, defendant sent an inquiry through its website, again using the fake name "c. even" and the fake company "abc" to avoid detection.  Exhibits 4, 30; testimony of Richard Johnson, defendant.  Meggitt employee Richard Johnson responded by email on January 10, 2013, and asked for clarification.  Testimony of R. Johnson.  In response, on January 14, 2013, defendant responded by sending a series of emails to Johnson using the ceven1073@gmail.com account, attaching "schematics.pdf," "scans.zip," and six of the seven images.zip files, along with the readme.doc.  In the emails, defendant directed Johnson to "please forward to engineering lcd avionics displays."  Exhibits 4, 30; testimony of Johnson.

60.     Also on January 14, 2013, defendant began to send out USB flash drives -- each containing exact copies of "schematics.pdf," "scans.zip," all seven images.zip files, and the readme.doc -- to Aspen, Meggitt, and Barco, Inc., also a company with an avionics department.  Exhibits 132-134, 137; testimony of defendant.  He mailed two drives to Aspen in Albuquerque, New Mexico, in two separate envelopes.  Exhibits 17, 18, 133.  He mailed one drive to Barco in Xenia, Ohio, and one to Barco in Duluth, Georgia.  Exhibits 20-24, 134.  He also mailed one drive to Meggitt, in Fareham, England.  Exhibits 1-3, 132.

61.     Defendant mailed out the USB flash drives because the files appeared to be too big to email, and he was having trouble completing the transmissions.  He went to a store and purchased the flash drives to complete the task.  Testimony of defendant.

62.     On each envelope defendnant typed the business name and address of the competitor company as both the recipient and sender of the envelope.  Exhibits 1, 21, 24.  Defendant also addressed each envelope to the engineering department of the competitor company.  Id.  Defendant included no information that would permit the recipient to identify him.

21

63.     While each company received the USB Flash drives, each was suspicious of receiving an unrequested thumb drives and did not insert them into their computers. Exhibits 132-134.  They did, however, retain the thumb drives.

64.     With every transmission, defendant sent out each of the seven charged trade secrets as well as numerous other RK trade secrets which could be used in tandem with all of the other information.  In several cases he sent out all, or almost all, of the schematics for the circuit boards that make up a product (for example, the Bell 430 IIDS, 427 DU, and 427 DAU).  Testimony of Owers; exhibits 7A-AA, 8A-M, 16.

65.     At no point did defendant transmit any PECC documents, including documents relating to the RAX driver, to any of PECC's competitors.

**F.     RK Discovered that the Trade Secrets Had Been Sent**

66.     When Meggitt employee Richard Johnson received the January 14, 2013 emails from defendant containing the trade secrets, he opened a few of the documents and was surprised by their contents.  He felt that the documents contained the "crown jewels" of RK, and were trade secrets that he was not supposed to be seeing.  Testimony of Johnson.

67.     Mr. Johnson soon thereafter informed Larry Smith, the president of RK, by email, that he had received the documents.  Exhibits 5, 132; testimony of Johnson, L. Smith.  Mr. Johnson reassured Mr. Smith that after he looked quickly at a few pages of the confidential data and read the readme.doc, he had recognized the material as sensitive, and thus no one else at Meggitt had looked at the information, and it had been deleted from Meggitt's servers and backups.  Exhibit 5.  Mr. Johnson then forwarded the emails and some of the information that he had received to Mr. Smith.

68.     On January 28, 2013, Mr. Johnson emailed again to say that Meggitt had now received the thumb drive that defendant had sent.  Exhibit 5; testimony of Johnson, L. Smith.  Meggitt had reviewed the directory for the drive, and it matched the files that were sent in the emails on January 14, 2013.  At the direction of Meggitt's lawyers,

employees of Meggitt then destroyed the drive, but sent the packaging, directories, and pictures to Mr. Smith.  Exhibits 1-3; testimony of Johnson, L. Smith.

69.     Mr. Johnson believed that the documents sent to him were trade secrets of RK, and, had he used, the documents, they would have had value to Meggitt.  He and other engineers would have compared the schematics to their own schematics to obtain design ideas, and this would have been valuable because it would have shortened development time for competing products.  Testimony of Johnson.  Even designs for circuit boards that did not work well would have been valuable to Meggitt because it still would have given Meggitt a starting point, and a window into how a competitor designs its product.  Testimony of Johnson.

70.     This discovery that its trade secrets had been sent to another company caused RK to investigate and to contact law enforcement.  Testimony of L. Smith.  Following further investigation which tied the sending of the information to defendant, as detailed above, law enforcement obtained a warrant to search defendant's home.  During the search, RK's trade secrets and other documents were found on defendant's computer, Exhibits 37-83, his USB flash drive, Exhibits 97-98, his phone, Exhibits 92-93, and in paper documents throughout the house, Exhibits 100-103, 105-106; testimony of Fitzpatrick.  In addition, the PECC trade secrets and other documents were found on defendant's computer.  Exhibits 84-90; testimony of Fitzpatrick.

### G.     The Value of the Trade Secrets

71.     The trade secrets at issue for both PECC and RK are valuable to those respective companies.  Testimony of defendant, Martinez, Owers, L.Smith, J. Smith, Conn, Warren, Cordova.

72.     Defense Expert Martinez agreed that the schematics at issue in this case have value.  Martinez opined that the documents have value to the victim companies based on the amount of time and money they put into the designs, and would also be of value to a competitor business.  Martinez opined that an engineer can tell a lot of

23

information from a schematic, and while reverse engineering is very difficult, a schematic would help that process.  A competitor could compare RK or PECC's schematics to their own products to see what design ideas are contained in those schematics, and if the competitor had similar products, or wanted to develop similar products, the schematics would be very useful.  Martinez also opined that if a schematic has passed certification requirements, the schematic is more valuable, and because schematics are frequently revised, engineers use previous schematics as starting points for new designs.  He testified that it is standard in the avionics industry for schematics to include outdated parts because, once a circuit board passes the testing and certification requirements, changes to its design are burdensome and time consuming.  Martinez testified that he would never give out the schematics or similar documents for his company because they are his company's proprietary information.  Martinez felt that the schematics at issue in this case have value, and the designs are unique and not obvious.  Testimony of Martinez.

73.     Based on the evidence presented at trial, the Court finds that had RK and PECC's competitors put the stolen schematics to use that likely would have resulted in serious losses to both victim companies.

74.     PECC calculates that it cost them approximately $500,000 to develop the RAX Driver.  Exhibit 129A; testimony of Warren, Conn.  The RAX has only recently entered the market, and PECC has several customers and potential customers who are interested in the product.  Testimony of Cordova, Mawhinney.  If the RAX Driver schematic had been successfully stolen by another company, it would have had a significant impact on PECC's ability to control its market share for the RAX Driver and similar products.  Exhibit 129B; testimony of Cordova.  Anticipated revenue for sales of the RAX and repairs through 2020 are $58,189,267.  Exhibit 129B.  Moreover, the schematic for the RAX Driver has many similarities to the schematics for other PECC products.  Therefore, the potential value of the RAX Driver schematic is likely more

than can be measured solely with reference to the market for the RAX Driver. Testimony of Conn, Cordova.

75.     From 2009-2011, it cost RK a total of $1,199,251 to develop the schematics for the 427 DU and DAU, 430 EFIS and IIDS, and KAI EHPD.  Exhibit 122; testimony of J. Smith.  Although the 427 and 430 products had been designed about a decade earlier, from 2009-2011, RK was engaged in what it called the "Reliability Improvement Program," which was a major upgrade of components to the 427 and 430 products. Testimony of Owers.  While defendant distributed schematics that were created in connection with the "Reliability Improvemem Program," these schematics were largely based off of the original schematics for the 427 and 430.  Accordingly, the actual cost of producing these schematics is likely higher than $1,199,251, as this figure does not account for the original development costs of those products.  Testimony of J. Smith.

76.     In addition, from 2015 through 2019, RK estimates that it will generate almost $18 million in revenue from new product sales for the 427, 430, and KAI products.  Exhibit 122; testimony of J. Smith.  Furthermore, in 2013-2014 alone, RK generated almost $3 million in revenue from its repair business for the five products at issue in this case.  RK anticipates generating over $4 million in revenue for repairs of those products from 2015 through 2019.  Exhibit 122; testimony of J. Smith.  If the schematics were known to another company, that company would be able to compete with RK for these revenues.  Testimony of L. Smith, J. Smith.

## IV.     CONCLUSIONS OF LAW

To the extent necessary, each of these conclusions of law may be deemed a finding of fact.

### A.     Counts 1-28: Transmission of RK Trade Secrets

For transmission of trade secrets as charged in Counts 1-28, the government must prove the following: (1) defendant knowingly transmitted, sent, mailed, communicated, or conveyed trade secret information knowing that he lacked authorization to do so; (2)

the information was, in fact, a trade secret because (A) it was information that the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public; (3) defendant intended to convert the trade secret to the economic benefit of anyone other than the owner; (4) defendant knew or intended that the offense would injure the owner of the trade secret; and (5) the trade secret was related to a product or service used or intended for use in interstate or foreign commerce.

Based on the evidence presented at trial, the Court finds that the government has proven the elements beyond a reasonable doubt for each of the seven charged trade secrets (Exhibits 7A, 7G, 7H, 7I, 7P, 7M, and 7X), and each of the four charged transmissions (January 9, 2013 email transmission to Aspen in Counts 1-7 and Exhibit 19; January 14, 2013 email transmission to Meggitt in Counts 8-14 and Exhibit 4; January 14, 2013 mailed transmission to Aspen in Counts 15-21 and Exhibit 17; and January 14, 2013 mailed transmission to Barco in Counts 22-28 and Exhibit 23).  Thus the Court finds defendant guilty of Counts 1-28.

## B.   Counts 29-32: Possession of RK Trade Secrets

For possession of trade secrets as charged in Counts 29-32, the government must prove the following: (1) defendant knowingly possessed trade secret information knowing that he lacked authorization to do so; (2) the information was, in fact, a trade secret because (A) it was information that the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public; (3) defendant intended to convert the trade secret to the economic benefit of anyone other than the owner; (4) defendant knew or intended that the offense would injure the owner of the trade secret;

26

and (5) the trade secret was related to a product or service used or intended for use in interstate or foreign commerce.

Based on the evidence presented at trial, the Court finds that the government has proven the elements beyond a reasonable doubt for each of the four charged trade secrets (the schematics detailed in Exhibits 7A, 7G, 7M, and 7P, as found within Exhibits 100 and 102) found in defendant's house on February 14, 2013.  Thus the Court finds defendant guilty of Counts 29-32.

### C.    Count 33: Possession of PECC Trade Secret

For possession of a trade secret as charged in Count 33, the government must prove the following: (1) defendant knowingly possessed trade secret information knowing that he lacked authorization to do so; (2) the information was, in fact, a trade secret because (A) it was information that the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public; (3) defendant intended to convert the trade secret to the economic benefit of anyone other than the owner; (4) defendant knew or intended that the offense would injure the owner of the trade secret; and (5) the trade secret was related to a product or service used or intended for use in interstate or foreign commerce.

Based on the evidence presented at trial, the Court finds that the government has not proven all of the elements beyond a reasonable doubt for the single charged PECC trade secret, Exhibit 85.  Specifically, while defendant prepared a "readme.doc" file for the PECC trade secret, there was no evidence presented at trial that he shared that trade secret information with any third parties.  Instead, the evidence presented at trial showed that the PECC trade secret sat idle on defendant's computer for two years.  Moreover, while the Government presented significant evidence that defendant harbored ill will

towards RK and desired to harm or embarrass RK with its competitors, the Government did not present similar evidence regarding defendant's feelings of ill will towards PECC.

Accordingly, the Court finds that the Government has not proven beyond a reasonable doubt that defendant either (a) intended to convert the PECC trade secret to the economic benefit of anyone other than the owner or (b) knew or intended that the offense would injure PECC.  Thus the Court finds defendant not guilty of Count 33.[8]

IT IS SO ORDERED.

DATE: January 4, 2016

_Christina A. Snyder_
HON. CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE

---

[8]  Defendant previously filed a motion to dismiss the indictment.  As the basis for this motion, defendant argued that the indictment was multiplicitous because it charged him with twenty-eight counts of transmitting trade secret information based upon only four distinct transmissions, and five counts of possession of trade secret information based upon only one simultaneous possession of trade secret information.  In ruling on defendant's motion, the Court agreed with defendant that the indictment was multiplicitous and that, in fact, defendant should only have been charged with four counts of transmitting trade secret information and one count of possession of trade secret information.  Nonetheless, the Court determined that, because the Government would present the same evidence regardless of the number of counts charged, it was not appropriate to dismiss the indictment at that time.  Accordingly, the Court denied defendant's motion and noted that defendant could renew his objection before sentencing if a judgement was entered against him on any of the multiplicitous counts.  Now that the Court has found defendant guilty as to thirty-two of the indictments counts, defendant may now renew his objection that the several of the counts in the indictment are multiplicitous.